# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00590-COA

**ROBERT MIDDLEBROOK**  **APPELLANT**

**v.**

**MEGAN FULLER AND MELANIE DUNN**  **APPELLEES**

DATE OF JUDGMENT:           04/21/2021
TRIAL JUDGE:                HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:  JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     MARCUS PITTMAN
ATTORNEY FOR APPELLEES:     STACIE ELIZABETH ZORN
NATURE OF THE CASE:         CIVIL - CUSTODY
DISPOSITION:                AFFIRMED - 10/18/2022
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     On April 21, 2021, the Jackson County Chancery Court entered a final judgment adjudicating Robert Middlebrook as M.F.'s father.[1] The final judgment also terminated his parental rights. Aggrieved by the court's judgment to terminate his parental rights, Middlebrook appealed. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Middlebrook and Megan Fuller were involved in a relationship several years prior to M.F.'s birth. However, the characterization of the relationship differs between the parties. According to Fuller, she met Middlebrook when she was seventeen years old through a friend

---

[1] Because of the nature of this case, fictitious names have been used for the parties to protect the identity of the minor child.

who was using drugs at the time. Fuller testified that when she "got on heavy drugs," she became more involved with Middlebrook and the people that he "r[an] with." Fuller testified that both she and her friend got their drugs from "Pony."[2] According to Fuller, she began doing "terrible things" to sustain her drug habit, which included having sex with Middlebrook and other random men. Fuller stated that she first began having sex with Middlebrook when she was around twenty years old. Middlebrook was thirty years older than Fuller. Middlebrook admits that he had sex with Fuller; however, he denied that he had sex with her before she turned twenty-one. He also denied that he used drugs, sold drugs, or allowed any drugs in his house. Middlebrook claimed that as a result of his sexual relationship with Fuller, M.F. was conceived. While Fuller admits that she had sexual relations with Middlebrook, she had no recollection of having sex with Middlebrook resulting in M.F.'s conception. Fuller originally denied that Middlebrook was M.F.'s father and claimed that the true father was a man named Brandon. M.F. was born on June 27, 2018. Middlebrook was not listed as the father on M.F.'s birth certificate. However, a DNA test report ultimately revealed that Middlebrook was M.F.'s father.

¶3. On June 20, 2019, Middlebrook filed a "Complaint to Establish Paternity and Custody and Motion for Ex-Parte Temporary Custody." Middlebrook's complaint requested that he be adjudicated M.F.'s father and also requested that Middlebrook be granted "paramount care, custody and control" of the minor child. Middlebrook alleged that he "fear[ed] for the physical and mental well being of the child, and fear[ed] that because of her addi[c]tion,

---

[2] Middlebrook's nickname is Pony, and there are references to "Pony" throughout the record in this case.

2

[Fuller] [could not] properly care for the child." On the same day that Middlebrook filed his complaint, the chancery court entered an ex parte order granting Middlebrook "immediate ex-parte temporary legal and physical custody of [M.F.]." Pursuant to the temporary order, the matter was set for hearing on July 1, 2019. On June 28, 2019, Fuller's mother, Melanie Dunn, filed a "Complaint to Intervene and for Emergency Custody." Dunn's filing alleged that Middlebrook was unfit to have custody of the minor child and that M.F. would suffer "probable harm" in his care. Dunn also alleged that Fuller was currently undergoing drug rehabilitation at an inpatient treatment facility and would be unable to attend the July 1 hearing. Because of the allegations concerning both Middlebrook and Fuller, Dunn requested that she be awarded emergency, temporary, and permanent sole physical and legal custody of M.F. On the same day that Dunn made her filing, the chancery court entered another temporary order awarding Dunn temporary physical and legal custody of M.F.

¶4. On July 1, 2019, Middlebrook and Dunn appeared for the return hearing on Middlebrook's complaint for paternity and custody. Fuller was not present at the July hearing. After considering the evidence and testimony presented by the parties, the chancery court entered an order appointing Matthew Pavlov as the guardian ad litem (GAL) and ordered Middlebrook to submit to paternity and genetic testing. The order also directed the GAL to "submit his findings along with [his] recommendation to the Court on or before 9:00 a.m. on July 3, 2019." On July 3, 2019, the chancery court entered an order transferring the case to the Jackson County Youth Court for an investigation into the allegations of abuse and neglect.

3

¶5. On January 23, 2020, Middlebrook filed another motion for temporary custody in Jackson County Chancery Court. Middlebrook's complaint alleged that nothing had been done in youth court since the case was transferred in July of the previous year. Pursuant to a letter from the Jackson County Youth Court dated February 10, 2020, the case was transferred back to the chancery court. The letter stated that there were "no options available through Youth Court for this matter."

¶6. On May 26, 2020, Fuller filed a "Complaint for Termination of Parental Rights." Her complaint alleged that Middlebrook's rights should be terminated because of

> [His] past and ongoing behavior of sexual and physical abuse of [Fuller] and other women, in-home sexual behavior, drug use in the home by multiple roommates and guests, multiple drug raids of his home, exposing the minor child to hypodermic needles of his fiancé[e] Anna, [her] drug use, and other behavior . . . .

The final pleading filed before the trial in this matter was Dunn's motion for child support filed on July 10, 2020.

¶7. The trial began on this matter on August 4, 2020, and continued for two more days (December 14, 2020, and April 20, 2021). Over the course of the trial, the chancery court heard testimony from Middlebrook, Fuller, Dunn, and the GAL. The chancery court entered its "Final Judgment Establishing Paternity and Terminating Parental Rights of Robert [Middlebrook]" on April 21, 2021. Middlebrook was adjudicated as M.F.'s father and his parental rights were terminated by the same judgment. Middlebrook filed his notice of appeal on May 20, 2021.

**STANDARD OF REVIEW**

4

¶8. "Appellate review in a case to terminate parental rights is the manifest error/substantial credible evidence test. . . . As long as there is credible evidence to support the chancellor's findings of fact, we must affirm the decision." *J.P. v. L.S.*, 290 So. 3d 345, 356 (¶36) (Miss. Ct. App. 2019) (citing *In re Dissolution of Marriage of Leverock & Hamby*, 23 So. 3d 424, 427 (¶14) (Miss. 2009). It is this Court's role to consider whether credible proof exists to support the chancery court's findings of fact by clear and convincing evidence. *Id*. However, "[i]t is not this Court's role to substitute its judgment for the chancellor's." *Id*.

**ANALYSIS**

¶9. Middlebrook argues that the chancery court's decision to terminate his parental rights was not supported by the evidence. Further, he argues that the chancery court erred by failing to specify its reasoning for not following the GAL's recommendation.

I. **Was the chancery court's decision to terminate Middlebrook's parental rights supported by clear and convincing evidence?**

¶10. Mississippi Code Annotated section 93-15-119 (Rev. 2021) provides in part that

(1) A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:

(a)(i) That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103, or is **mentally, morally, or otherwise unfit to raise the child**, which shall be established by showing past or present **conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare**; and

(ii) That termination of the parent's parental rights is appropriate

5

> because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome.
>
> (b) That a parent has committed against the other parent a sexual act that is unlawful under Section 97-3-65 or 97-3-95 . . . .

(Emphasis added).

¶11. On the first day of trial, Middlebrook was sixty-two years old, unemployed, and drawing disability in the amount of $1,300 each month. However, Middlebrook testified that after deductions he cleared only $800 each month. When asked about other sources of income, Middlebrook stated that he gambled and that when he "cuts" a poker game, he can make up to $1,500 on any given weekend. According to Middlebrook, he is rumored to have up to thirty biological children; however, he only has genetic proof that he is the father of twelve or thirteen of those children. He testified that he has never had court-ordered visitation with any of his children and has paid child support for only four or five of them. According to Middlebrook, he had not seen M.F. in over one year and had not provided Dunn any support for the minor child during the time that Dunn had court-ordered custody.

¶12. While Middlebrook denies that he uses, sells, or allows the use of drugs in his home, he testified that his home is open to people who find themselves in need of a place to stay, some of whom admittedly are felons. It is undisputed by both Middlebrook and Fuller that on one occasion, they found M.F. with a syringe in her mouth at Middlebrook's home. Fuller testified the cap was off, and the needle was broken. According to Middlebrook, he picked up the baby, and she stopped crying and appeared to be unharmed. Ultimately, Fuller called Dunn, and she took the baby to the hospital. Luckily M.F. did not have any medical

6

complications as a result of the incident. Middlebrook admitted that he also is a felon, but testified that his conviction for drugs and money laundering was thirty years old and he has served his time. Although he denied as much in his discovery responses, Middlebrook testified at trial that law enforcement had raided and searched his home on at least one occasion. He blamed the raid on his fiancée Anna and another girl who had "got in trouble[,] . . . and [law enforcement] came back later because they had a reason to search the house for drugs." Middlebrook and Anna had been engaged for fifteen years. But Middlebrook admitted that he rents hotel rooms "often here and there" to have sex with other women because he did not want Anna to know about his sexual encounters. Notably, Fuller was one of the young women that Middlebrook was having sex with during the time he was engaged to Anna. Middlebrook confirmed that Anna had been arrested two or three times and at least one time at his home. The record reflects that Anna had been arrested for possession of marijuana, public drunkenness, and shoplifting. Anna was incarcerated at the time of trial in this matter on a felony drug-transfer charge. Prior to her incarceration, Anna was always with Middlebrook when he had M.F. in his custody.

¶13. While Fuller's testimony at trial corroborated much of Middlebrook's testimony, her testimony varied as to the extent of Middlebrook's participation in drug activity and sexual activity. Fuller testified that she was prescribed Suboxone, but instead of taking the medication as prescribed, she would give the pills to Middlebrook along with her food stamps in exchange for a room at his home. She also stated that Middlebrook would give her

Opana[3] in exchange for sex with him and other men. Fuller was asked at trial, "Mr. [Middlebrook]would, for lack of a better term, pimp you out, make you have sex with other people; is that true?" Fuller answered "Yes. . . . They would meet in his bedroom and they would make an exchange, and I would meet with them and have sex." Fuller testified that Middlebrook gambled every night and stayed out until 6:00 or sometimes 8:00 in the morning. According to Fuller there was "all kinds of drug activity" going on in Middlebrook's home. Fuller testified that drugs were "all over the place" and that people were "all over the place, falling asleep." She alleged that Middlebrook would send people to Wal-Mart and other stores to steal because they owed him money for drugs. Fuller described one specific fight at Middlebrook's house:

> It was his daughter Tytaleia, and she got into the fight with this other girl, and then her boyfriend start jumping in on it or something, and so Pony gets in it and they get – mind you, my daughter is on [Anna]'s hip, and they come out with baseball bats, and punching women in the face, and [Anna] has my baby on her hip. I went in this fight and pulled my baby out, and not even five minutes later, a 17-year-old boy hits [Anna] in the back of the head, teeth go in the concrete, blood everywhere, I mean right when I took my daughter.

Fuller testified that she was scared for her child's safety if the court did not terminate Middlebrook's parental rights.

¶14. Matthew Pavlov, the GAL, testified at trial regarding his investigation of the case and gave his recommendation to the chancery court. Pavlov described Middlebrook as one of "the most colorful" people he had ever met and stated that he had "adventurous sexual taste." Pavlov testified that Middlebrook had "threesomes" with his fiancée and went to the Days

---

[3] Opana is the brand name for a narcotic called oxymorphone, a drug used to treat moderate to severe pain, as well as anxiety caused by some medical conditions.

Inn to have sex with random women. This testimony is consistent with Fuller's. According to Pavlov, when Middlebrook came to his office on one occasion, he "[brought] me some rather scandalous-looking ladies to back him up, and he has been accused of being a pimp."

¶15.    Pavlov testified that Middlebrook has an "open-door" policy and lives in a poor area of Moss Point. According to Pavlov,

> Yesterday when I was there, he had a fellow . . . I believe his name was Wayne, who he says stays with him, you know, most nights of the week. He says Wayne is probably bipolar or schizophrenic and has outbursts of profanity and anger, . . . Mr. [Middlebrook] seems to think he should help watch out for this fellow. . . .
>
> In the past, I have been at his house, and I thought for sure what I was seeing was a drug deal going on, and [Middlebrook] swears up and down that, no, this is a homeless lady that needed a sandwich and water. . . .
>
> This household as it is right now makes me very nervous to have a two-year-old, almost three-year-old living there. . . .
>
> [Middlebrook] has to stop letting homeless people in his house. He needs to not let drug addicts in his house. He needs to lock this stuff up and live a more traditional way if he wants to have overnight visitation with his child.

Near the conclusion of Pavlov's testimony, he and the chancellor had the following exchange:

> THE COURT:              Mr. Pavlov, I am going to ask you three questions. I want a "yes" or "no" answer.
>
> GUARDIAN AD LITEM: Yes, sir.
>
> THE COURT:              During the period of time that you have investigated Mr. [Middlebrook], has he had drug addicts living in his home?
>
> GUARDIAN AD LITEM: Absolutely.

9

| | |
|---|---|
| THE COURT: | During the period of time that you've investigated this, has he had convicted felons living in his home besides himself? |
| GUARDIAN AD LITEM: | Yes, I believe [Anna] has been convicted, yes, sir. |
| THE COURT: | Do you believe that [Fuller's] allegations of abuse by him and in whatever form, small or great, are true? |
| GUARDIAN AD LITEM: | Yes, I believe her, yes, I do. |
| THE COURT: | Thank you. |

¶16. Despite, the concerns that Pavlov had about Middlebrook's lifestyle, Pavlov did not recommend that Middlebrook's rights be terminated. However, the chancery court stated that "based on the law, the findings and recommendations of the Guardian ad Litem are erroneous." In its ruling, the court recognized that it is clear from the record that while Middlebrook may not use drugs, he surrounds himself with people who do. Further, it is clear from the record that both the GAL and the chancery court believed Fuller's testimony that Middlebrook sexually abused her. Finally, the GAL testified and the chancery court acknowledged that Middlebrook's lifestyle and current living arrangements were not conducive for M.F. and could compromise her safety and welfare. Therefore, we find no error by the chancery court in finding that there was clear and convincing evidence sufficient to terminate Middlebrook's parental rights.

**II. Did the chancery court err in failing to specify its reason for not following the recommendation of the GAL?**

¶17. In *Barbaro v. Smith*, 282 So. 3d 578, 600 (¶100) (Miss. Ct. App. 2019), this Court explained:

A chancellor is required by law to appoint a GAL in any child custody case in which there is a "legitimate" charge of abuse or neglect . . . . In such cases, "there is no requirement that the chancellor defer to the findings of the guardian ad litem. . . . Such a rule would intrude on the authority of the chancellor to make findings of fact and to apply the law to those facts." However, the Supreme Court has held that "when a chancellor's ruling is contrary to the recommendation of a statutorily required guardian ad litem, the reasons for not adopting the guardian ad litem's recommendation shall be stated by the court in the findings of fact and conclusions of law.

(Citations omitted).

¶18.    In this case, the chancellor stated on the record:

There is a petition to terminate the parental rights of Mr. [Middlebrook]. We have a Guardian ad Litem who is well known to this court. Well qualified to this court who struggled with this case, and wrote an excellent report. And in his findings, he recommended that the court not terminate Mr. [Middlebrook's] rights. However, the Court finds that the law requires Mr. [Middlebrook's] rights to be terminated, and here is why. . . .

The next two pages of the transcript contain the chancellor's rationale for its decision to terminate Middlebrook's parental rights. In its ruling, the chancery court considered Middlebrook's "long history of involvement with convicted felons and drug addicts," non-traditional sexual appetite, abuse of Fuller, M.F.'s mother, and other factors. Likewise, the final judgment in this matter clearly acknowledged the court's consideration of the GAL's report and its reasons for the ultimate decision to terminate Middlebrook's parental rights. Therefore, we find no error in the chancery court's ruling contrary to the GAL's recommendation.

**CONCLUSION**

¶19.    After reviewing the record, we find no error, and the judgment of the chancery court is affirmed.

11

¶20.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**